| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO. |

McKINLEY, INC.,

    Plaintiff,

vs.

SS MANAGEMENT GROUP, INC.,
DAVID ASH,
KATHIE KORYCANEK, and
JOHN DOE,

    Defendants.

49D07 10 04 MF 0 1 5 1 7 6 - 00(

FILED
FEB 09 2012

## COMPLAINT FOR INJUNCTIVE RELIEF, DEFAMATION, AND TORTIOUS INTERFERENCE

Plaintiff McKinley, Inc. ("**McKinley**"), by its undersigned attorneys, for its Complaint for Injunctive Relief, Defamation, and Tortious Interference against Defendants SS Management Group, Inc. ("**SS Management**"), David Ash ("**Ash**"), Kathie Korycanek ("**Korycanek**"), and John Doe ("**Doe**") alleges and states as follows:

### I. Parties, Jurisdiction, and Venue

1. McKinley is a Michigan corporation with its principal place of business in Ann Arbor, Michigan.

2. According to Illinois public records, SS Management is an Illinois corporation.

3. SS Management systematically and continuously conducts business in Marion County, Indiana.

4. Upon information and belief, Ash is or has been an employee of SS Management.

5. Upon information and belief, Ash may be a pseudonym.

6. Upon information and belief, Korycanek is or has been a Secretary at SS Management.

7. SS Management manages and uses real property in Marion County, Indiana, including the Private Reserve and Carmel Creek (f/k/a Las Palmas) apartment complexes located in Indianapolis, Indiana.

8. SS Management, Ash, and Korycanek published defamatory statements on the Internet about McKinley relating to proceedings before this Court. The defamatory statements made by SS Management, Ash, and Korycanek relate to real property located in Marion County, Indiana.

9. The defamatory statements published by SS Management, Ash, and Korycanek on the Internet were available to, and appear to have been directed to, persons in Marion County, Indiana. (For example, the defamatory statements were published on the following Marion, Indiana website: www.inhoosier.com/marion-indiana.)

10. Upon information and belief, agents of SS Management, including, but not limited to, Korycanek, were physically present in Marion County, Indiana in connection with the publication of defamatory statements on the Internet by SS Management, Ash, and Korycanek.

11. At the time of filing this Complaint, McKinley does not know the actual identity of the Doe Defendant, and therefore sues under a fictitious name. McKinley also does not know whether Ash is a pseudonym. Once the identities of Ash and the Doe Defendant are ascertained, McKinley will seek leave to amend this Complaint accordingly. McKinley also intends to seek leave to amend to add as defendants any persons responsible for directing or authorizing the Defendants to commit the tortious acts described in this Complaint.

12. Venue is proper in this county under Indiana Rule of Trial Procedure 75.

13. Marion County is a preferred Venue under Indiana Rule of Trial Procedure 75.

2

## II. The Related Case Before this Court

14. The causes of action asserted in this Complaint relate to the ongoing proceedings before this Court in Cause No. 49D07-1004-MF-015176, *PNC Bank v. Luxury Townhomes, LLC, LP XXIV, LLC, State of Indiana, and Blakely Corporation* (the "**Related Case**").

15. On or about July 21, 2010, the Court entered an Order Appointing Receiver (the "**Receiver Order**," attached as **Exhibit 1**) in the Related Case, which, among other things, appointed Kenneth P. Polsinelli (the "**Receiver**") of McKinley as receiver over two apartment complexes located in Indianapolis, Indiana: Carmel Creek (f/k/a Las Palmas) and Private Reserve (together, the "**Indianapolis Properties**").

16. The Receiver retained McKinley to manage the Indianapolis Properties.

17. Carmel Creek is owned by LP XXIV, LLC ("**LP**").

18. Private Reserve is owned by Luxury Townhomes, LLC ("**Luxury**").

19. On or about August 4, 2011, Luxury and LP filed a Request for Leave to Join and Assert Claims Against the Receiver & McKinley Properties, Inc. (the "**Request**," attached as **Exhibit 2**). In sum, Luxury alleges that the Receiver mismanaged the Indianapolis Properties during the seven months they were in the possession of the Receiver and McKinley. Luxury has requested a jury trial.

20. On or about December 2, 2011, the Receiver and McKinley filed their Brief in Response to Luxury's Objections and Luxury's Request for Leave to Join and Assert Claims Against the Receiver and McKinley (the "**Response**," attached as **Exhibit 3**). The Receiver and McKinley have opposed the Request primarily on the ground that each properly performed the jobs assigned to them by the Court.

21. The Response illustrates that many of the allegations in the Request are frivolous. For example, the Indianapolis Properties were in need of millions of dollars in repairs before the

Receiver and McKinley took possession. When the Receiver requested funding advancements to allow repairs, Luxury and LP objected to the bank making the requested funding advancements. Further, the Receivership's dire need of funding was exacerbated by Luxury's and LP's non-compliance with the Receiver Order, including their failure to turn over funds needed to operate the Indianapolis Properties and leaving few to no records.

22. The Receiver and McKinley have vigorously opposed the Request, rebutted the factual allegations in the Request, and set forth abundant legal authority to support their position that the Request ought to be denied. If the Request is denied, there will of course be no lawsuit against the Receiver and McKinley.

23. An evidentiary hearing on the Request is scheduled to begin on March 7, 2012, continuing on March 8, 2012, as necessary.

24. The Court has not yet ruled on the Request.

### III.   Factual Background

A. **SS Management manages the properties at issue in the Related Case: Carmel Creek and Private Reserve.**

25. SS Management manages and uses the Indianapolis Properties.

26. According to public records, SS Management, Luxury, and LP are each located at 200 E. Howard St, Ste. 296, Des Plaines, IL 60018.

27. To their Request, Luxury and LP attached several emails to and from Val Sklarov, SS Management's President. (See, e.g., Request Exhibits E, G, H, I, and N.)

28. To their Request, Luxury and LP attached several emails to and from Korycanek, SS Management's Secretary. (See, e.g., Request Exhibits E, F, G, and H.)

29.  According to the emails attached to the Request, Korycanek was onsite at the Indianapolis Properties on various occasions, and Request Exhibit H shows that she distributed her SS Management email address (kathie@ssmanagementgroup.com) while she was onsite.

**B.  SS Management, Ash, and Korycanek defamed McKinley by publishing Purported Releases on the website PRLog.org.**

30.  SS Management, Ash, and Korycanek published purported press releases containing numerous false statements about McKinley on the Internet website PRLog.org.

31.  The website PRLog.org offers, among other services, the ability for any person to create a free account, and to submit and distribute press releases.

32.  SS Management and Ash or SS Management and Korycanek posted each of the following purported "press releases" (the "**Purported Releases**," and each individually a "**Purported Release**") on PRLog.org:

    a)  *Suit Filed Against 38th largest Apartment Community Manager in the United States*, dated November 22, 2011 (the "**November 22 Purported Release**," **Exhibit 4**);

    b)  *High Profile Attorney Retained by Plaintiff in Suit Filed Against McKinley, Inc.*, dated December 28, 2011 (the "**December 28 Purported Release**," **Exhibit 5**); and

    c)  *New Developments In lawsuit filed against Michigan Based Receiver in Indiana for Negligence*, dated January 11, 2012 (the "**January 11 Purported Release**," **Exhibit 6**).

33.  The November 22 Purported Release by SS Management shows that it was issued by Ash. The address provided for Ash is 200 E. Howard, Suite 296, Des Plaines, IL 60018.

34.  The December 28 Purported Release by SS Management shows that it was issued by Kathie Kory, which appears to be a pseudonym for Korycanek.

35.  The January 11 Purported Release by SS Management shows that it was issued by Kat Kor, which appears to be a pseudonym for Korycanek.

36. Each of the Purported Releases was accessible as of the morning of January 17, 2012 on PRLog.org.

37. Each of the Purported Releases was accessible to anyone with an Internet connection, including potential jurors in Marion County.

38. Each of the Purported Releases (a) falsely, misleadingly, and unfairly describes the proceedings in the Related Case, (b) repeats numerous false allegations made in the Related Case as if they are fact and without the qualification that they are allegations which McKinley has denied and rebutted, and (c) asserts additional false allegations that have not been made in the Related Case.

39. Each of the Purported Releases inaccurately describes the Related Case, including by stating that a lawsuit has been commenced against the Receiver and McKinley.

40. The January 11 Purported Release inaccurately describes the Related Case by stating that a lawsuit has been filed against the Receiver and McKinley, and falsely implying that the Court has permitted a lawsuit to proceed notwithstanding "certain immunities" provided to receivers.

41. Each of the Purported Releases falsely states, without qualification, that McKinley and the Receiver were negligent in the management of the properties at issue in the Related Case.

42. Each of the Purported Releases falsely states, without qualification, that McKinley and the Receiver misused funds and abused receivership powers.

43. The January 11 Purported Release falsely states, without qualification, that the owner of the properties at issue in the Related Case "was cheated out of funds."

6

44. The January 11 Purported Release falsely states that the "plaintiffs" in the Related Case have alleged that McKinley and Receiver "conspired to devalue the properties." There has been no such allegation in the Related Case.

45. In addition to the statements enumerated above, each of the Purported Releases contains additional false statements about McKinley.

C. **Numerous defamatory statements identical or similar to the Purported Releases have been published on various Internet websites.**

46. Numerous defamatory statements identical or similar to the Purported Releases have been published on various Internet websites.

47. PRLog.org provides an explanation about how the press releases posted on its website are distributed on the Internet. The explanation, which is available at http://www.prlog.org/tips/1017-free-press-release-distribution.html, is attached as **Exhibit 7**.

48. By posting the Purported Releases on PRLog.org, SS Management, Ash, and Korycanek caused the Purported Releases to be published on numerous websites across the Internet. Upon information and belief, such publication remains ongoing.

49. As of the date of filing this Complaint, portions of the Purported Releases had been published on numerous Internet websites, including, but not limited to, www.inhoosier.com/marion-indiana, www.scamraiders.com, www.realestateforum.com, groups.tigweb.org, www.playak.com, community.essence.com, and www.allvoices.com.

50. Upon information and belief, certain publications of the Purported Releases on websites other than PRLog.org appear to have been made directly by SS Management, Ash, Korycanek and/or Doe, and not via publication through PRLog.org's distribution.

7

**D.  Doe sent defamatory Cover Letters with the November 11 Purported Release to McKinley's lenders and business partners.**

51.  McKinley recently discovered that certain of its lenders and business partners have received an anonymous letter with a copy of the November 11 Purported Release attached (the "**Cover Letter**" individually, and collectively the "**Cover Letters**").  A copy of the Cover Letter is attached as **Exhibit 8**.

52.  A significant portion of McKinley's revenue is generated by work that McKinley performs for clients, lenders, and business partners upon being retained as a receiver and/or property manager.

53.  The Cover Letters make false, misleading, and defamatory statements about McKinley.

54.  The Cover Letters falsely and misleadingly state that the Purported Releases are "online new[s] stor[ies]."

55.  The Cover Letters make false allegations of McKinley's "negligence" and "malfeasance" as a receiver.

56.  The Cover Letters also falsely allege that McKinley and the Receiver committed "improprieties" and mismanaged the properties in the Related Case.

57.  The Cover Letters falsely and misleadingly state that the Purported Releases discuss filed "lawsuits" against McKinley.

58.  Doe sent the defamatory Cover Letters to McKinley's lenders and business partners.

59.  The PrivateBank, a McKinley lender and business partner located in Bloomfield Hills, Michigan, received a Cover Letter via U.S. mail in an envelope postmarked January 10, 2012.

60. Chelsea State Bank, a McKinley lender and business partner located in Chelsea, Michigan, received a Cover Letter via U.S. mail on January 12, 2012.

61. McKinley continues to investigate whether other of its clients, lenders, and business partners have received Cover Letters.

62. By sending copies of the anonymous Cover Letters to McKinley's lenders and business partners, Doe republished the false, misleading, and defamatory statements contained in the November 11 Purported Release.

**E. McKinley demanded that SS Management and/or its affiliates, agents, employees, and alter egos immediately cease and desist from making any additional false, misleading, and defamatory statements about McKinley, and delete and retract any such statements made in the past.**

63. On January 17, 2012, McKinley sent a letter (attached as **Exhibit 9**) to Val Sklarov, Sharon Sklarov, Korycanek, and Ash putting them and SS Management on notice of the defamatory Purported Releases and Cover Letters, and demanding (a) the immediate deletion and removal of the Purported Releases from PRLog.org and all other websites, (b) the immediate retraction of the statements in the Purported Releases, and (c) that SS Management and/or its affiliates, agents, employees, and alter egos immediately cease and desist from making false, misleading, and defamatory statements about McKinley.

64. Also on January 17, 2012, McKinley sent a letter (attached as **Exhibit 10**) to Jennifer Graham (who has appeared in the Related Case as counsel for Luxury and LP) putting her and her clients on notice of the defamatory Purported Releases and Cover Letters and demanding that Luxury and LP and/or its affiliates, agents, employees, and alter egos immediately cease and desist from making any such false, misleading, and defamatory statements.

65. Later on January 17, 2012, after McKinley's letters had been sent to SS Management and Ms. Graham, the Purported Releases were no longer available on PRLog.org.

66. On January 23, 2012, McKinley sent a letter (attached as **Exhibit 11**) to Ms. Graham specifically identifying several of the numerous websites on which her clients had published the Purported Releases and repeating its demands that her clients immediately (a) remove and delete from PRLog.org and all other websites the Purported Releases and all other false, misleading, and defamatory statements about McKinley made by SS Management Group, Inc.; Luxury Townhomes, LLC; LP XXIV, LLC; and any agents, affiliates, employees, and alter egos of the forgoing entities; (b) retract the statements made in the Purported Releases by issuing retractions on PRLog.org and all other websites on which the Purported Releases were published; and (c) cease and desist from making and publishing any false, misleading, and defamatory statements about McKinley.

67. On January 23, 2012, Ms. Graham notified McKinley's counsel that SS Management had issued a retraction on PRLog.org. The retraction (the "**Purported Retraction**") is attached as **Exhibit 12**.

68. The Purported Retraction is not an adequate retraction.

69. The Purported Retraction incorporates and attempts to bolster the defamatory statements in the Purported Releases, which remain available on various Internet websites as of the time of the filing of this Complaint.

70. The Purported Retraction falsely and misleadingly states and implies that the defamatory statements in the Purported Releases are allegations made in a lawsuit pending before this Court.

71. In its Purported Retraction, SS Management did not retract its prior false, misleading, and defamatory statements.

10

72. On January 24, 2012, McKinley notified Ms. Graham via facsimile and e-mail (attached as **Exhibit 13**) that the Purported Retraction was inadequate, and demanded that SS Management delete and retract the Purported Retraction and not issue any further statements regarding this matter without McKinley's prior approval.

73. On January 25, 2012, Ms. Graham informed McKinley that SS Management does not intend to delete and retract the Purported Retraction and will not agree to refrain from issuing any further statements regarding this matter.

74. As of the date of filing this Complaint, SS Management has not issued any retractions other the Purported Retraction.

75. McKinley has given SS Management more than reasonable time to issue proper retractions.

**Count I**
**Defamation – SS Management, Ash, and Korycanek**

76. The allegations of paragraphs 1-75 are incorporated by reference herein with the same force and effect as if set forth in full.

77. SS Management, Ash, and Korycanek have made false and defamatory statements about McKinley.

78. The Purported Releases and the Purported Retraction were unjustified in law and are not entitled to any protection or privilege.

79. SS Management, Ash, and Korycanek had actual knowledge of the falsity of the statements in the Purported Releases, or, alternatively, were recklessly indifferent or negligent as to their truth or falsity.

80. SS Management had actual knowledge of the falsity of the statements in the Purported Retraction, or, alternatively, was recklessly indifferent or negligent as to their truth or falsity.

81. SS Management, Ash, and Korycanek published the Purported Releases in bad faith and with actual malice.

82. SS Management published the Purported Retraction in bad faith and with actual malice.

83. The Purported Releases and Purported Retraction cast aspersions upon McKinley's honesty, efficiency, and business character. The Purported Releases and Purported Retraction impute to McKinley fraud, deceit, dishonesty, and reprehensible conduct in its business and the carrying out of its business activities. They also contain imputations upon McKinley with respect to its business, its ability to do business, and its methods of doing business. Therefore, the Purported Releases and Purported Retraction are *per se* defamatory.

84. The publication of the Purported Releases and Purported Retraction will tend to prejudice McKinley in the conduct of its business, deter others from dealing with McKinley, and harm the reputation of McKinley by lowering McKinley's estimation within the community.

85. McKinley has been injured by the publication of the Purported Releases and Purported Retraction.

86. Upon information and belief, the publication of the Purported Releases and Purported Retraction has already prejudiced McKinley in the conduct of its business, deterred others from dealing with McKinley, and caused McKinley special injury, including, but not limited to, lost revenue and damaged goodwill and reputation among current and potential clients.

87. As a consequence of the foregoing, McKinley has suffered and will continue to suffer irreparable harm and loss.

**Count II**
**Tortious Interference with Business Relationships and Expectancies –**
**SS Management, Ash, and Korycanek**

88. The allegations of paragraphs 1-87 are incorporated by reference herein with the same force and effect as if set forth in full.

89. SS Management, Ash, and Korycanek knew that among those that would receive the Purported Releases are current McKinley clients, lenders, and business partners, or parties with whom McKinley has a reasonable and valid business relation and/or expectancy.

90. By publishing the Purported Releases, SS Management, Ash, and Korycanek intended to improperly interfere with, or cause the breach or termination of, one or more such relationships and/or expectancies.

91. SS Management knew that among those that would receive the Purported Retraction are current McKinley clients, lenders, and business partners, or parties with whom McKinley has a reasonable and valid business relation and/or expectancy.

92. By publishing the Purported Retraction, SS Management intended to improperly interfere with, or cause the breach or termination of, one or more such relationships and/or expectancies.

93. The actions of SS Management, Ash, and Korycanek described herein were wrongful *per se*.

94. At all relevant times, the actions of SS Management, Ash, and Korycanek were done with malice and were unjustified in law.

13

95. As a result of the actions of SS Management, Ash, and Korycanek, McKinley has suffered injury, including, but not limited to, diminished goodwill and, upon information and belief, lost business opportunities and/or business relationships.

96. As a consequence of the foregoing, McKinley has suffered and will continue to suffer irreparable harm and loss.

**WHEREFORE**, by virtue of the foregoing acts complained of in Counts I and II, McKinley demands judgment in its favor and against SS Management, Ash, and Korycanek for all damage and harm caused to McKinley by SS Management, Ash, and Korycanek (including, but not limited to, consequential, exemplary, and punitive damages, as provided under MCL 600.2911 and other applicable law), for an award of attorneys' fees, for an award of costs, and for all other just and appropriate relief.

### Count III
### Defamation – Doe

97. The allegations of paragraphs 1-96 are incorporated by reference herein with the same force and effect as if set forth in full.

98. Doe has made false and defamatory statements about McKinley.

99. The Cover Letters were unjustified in law and are not entitled to any protection or privilege.

100. Doe had actual knowledge of the falsity of the statements in the Cover Letters, or, alternatively, was recklessly indifferent or negligent as to their truth or falsity.

101. Doe sent each of the Cover Letters in bad faith and with actual malice.

102. The Cover Letters cast aspersions upon McKinley's honesty, efficiency, and business character. The Cover Letters impute to McKinley fraud, deceit, dishonesty, and reprehensible conduct in its business and the carrying out of its business activities. They also

contain imputations upon McKinley with respect to its business, its ability to do business, and its methods of doing business. Therefore, the Cover Letters are *per se* defamatory.

103.  Doe's publication of the Cover Letters will tend to prejudice McKinley in the conduct of its business, deter others from dealing with McKinley, and harm the reputation of McKinley by lowering McKinley's estimation within the community.

104.  McKinley has been injured by Doe's publication of the Cover Letters.

105.  Upon information and belief, Doe's publication of the Cover Letters has already prejudiced McKinley in the conduct of its business, deterred others from dealing with McKinley, and caused McKinley special injury, including, but not limited to, lost revenue and damaged goodwill and reputation among current and potential clients.

106.  As a consequence of the foregoing, McKinley has suffered and will continue to suffer irreparable harm and loss.

### Count IV
### Tortious Interference with Business Relationships and Expectancies – Doe

107.  The allegations of paragraphs 1-106 are incorporated by reference herein with the same force and effect as if set forth in full.

108.  Doe knew that among those that would receive the Cover Letters are current McKinley clients, lenders, and business partners, or parties with whom McKinley has a reasonable and valid business relation and/or expectancy.

109.  By publishing the Cover Letters, Doe intended to improperly interfere with, or cause the breach or termination of, one or more such relationships and/or expectancies.

110.  Doe's actions described herein were wrongful *per se*.

111.  At all relevant times, Doe's actions were done with malice and were unjustified in law.

112. As a result of Doe's actions, McKinley has suffered injury, including, but not limited to, diminished goodwill and, upon information and belief, lost business opportunities and/or business relationships.

113. As a consequence of the foregoing, McKinley has suffered and will continue to suffer irreparable harm and loss.

**WHEREFORE**, by virtue of the foregoing acts complained of in Counts III and IV, McKinley demands judgment in its favor and against Doe for all damage and harm caused to McKinley by Doe (including, but not limited to, consequential, exemplary, and punitive damages, as provided under MCL 600.2911 and other applicable law), for an award of attorneys' fees, for an award of costs, and for all other just and appropriate relief.

### Count V
### Injunctive Relief

114. The allegations of paragraphs 1-113 are incorporated by reference herein with the same force and effect as if set forth in full.

115. By virtue of the foregoing, McKinley has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

116. The Defendants' publication of defamatory statements about McKinley have been committed in aid of the Defendants' tortious interference with McKinley's reasonable and valid business relations and/or expectancies.

117. Injunctive relief is essential to preserve McKinley's property rights, including, but not limited to, its business reputation and goodwill.

118.  Unless the Defendants are enjoined from the foregoing conduct, McKinley will be irreparably harmed, including, but not limited to, by the damage to its business reputation and goodwill, which will deter current and potential clients from dealing with McKinley.

119.  The damage caused to McKinley by the Defendants' actions is not easily quantifiable.

120.  Issuance of an injunction is in the public interest. Among other things, the Defendants' defamatory publications about McKinley are particularly inequitable given that Luxury and LP are seeking a jury trial in this Court.

121.  Issuance of an order enjoining the Defendants from making false statements about McKinley and tortiously interfering with McKinley's reasonable and valid business relations and/or expectancies will not cause any harm to the Defendants.

122.  Issuance of an injunction will not inflict a greater injury on others and is necessary to maintain the status quo.

123.  McKinley has no adequate remedy at law for the harm caused by the Defendants' publication of defamatory statements about McKinley and tortious interference with McKinley's business relationships and expectancies.

**WHEREFORE**, McKinley respectfully requests that the Court issue an injunction enjoining Defendants, directly or indirectly, whether alone or in concert with others, from:

(a)  Publishing false, misleading, and defamatory statements about McKinley; and

(b)  Sending communications to McKinley's current and potential clients, lenders, and business partners containing false, misleading, and defamatory statements about McKinley;

and grant any and all other relief as the Court deems appropriate.

_____
Pfenne P. Cantrell

KIGHTLINGER & GRAY, LLP
Pfenne P. Cantrell (Attorney No. 18555-49)
J. Andrew Price (Attorney No. 26545-49)
Market Square Center, Suite 600
151 North Delaware Street
Indianapolis, IN 46204
Telephone: (317) 968-8181
Email: pcantrell@k-glaw.com

and

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Daniel W. Linna Jr. (P68863)
Kelsey Switzer (P75740)
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Telephone: (313) 465-7508
Email: dlinna@honigman.com

10282161.9